IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JEREMY LAJEUNESSE,

Plaintiff,

vs.                                        No. CV 18-214 KG/JHR

BNSF RAILWAY COMPANY,

Defendants.

AMENDED MEMORANDUM OPINION AND ORDER

Discovery in civil litigation is, at its core, a fact-finding, truth-seeking process.  As such, it demands good faith, unambiguous, direct and forthright participation from litigants.  It is because these objectives have been frustrated here that Defendant BNSF Railway Company (BNSF) has filed the instant Motion to Dismiss Plaintiff's Complaint as a Sanction for Plaintiff's Willful Abuse of Discovery Process (Motion to Dismiss), filed November 16, 2018.  (Doc. 56).  Plaintiff Jeremy LaJeunesse (LaJeunesse) filed his response in opposition on December 20, 2018, and BNSF filed its reply on January 24, 2019.  (Docs. 64 and 73).  Having considered the briefing and exhibits, the record, and the applicable law, the Court grants BNSF's Motion to Dismiss, dismisses this case with prejudice, and retains jurisdiction over the parties to determine the issue of attorney's fees and costs.

I.      Background and Procedural History

LaJeunesse filed this Federal Employers Liability Act (FELA) claim against his former employer, BNSF, on March 6, 2018.  (Doc. 1).  FELA creates a federal cause of action for employees of "[e]very common carrier by railroad" when those employees are injured at work and engaged in activities "further[ing] . . . interstate or foreign commerce . . . or . . . directly or closely and substantially[ ] affect[ing] such commerce."  45 U.S.C. § 51.

LaJeunesse worked as a Motorized Track Inspector at the BNSF railyard in Belen, New Mexico, on December 20, 2017, when he allegedly drove his BNSF-assigned Kubota at approximately 5-8 miles per hour and "unexpectedly . . . struck a consecutive series of 3 large washed-out holes that were about 18" deep." (Doc. 1) at 2. LaJeunesse contends the injury occurred around 10:00 a.m. and caused "immediate pain in his back, but continued working the rest of his shift." (*Id.*) The parties agree that LaJeunesse "was in the course and scope of his employment" at the time of the alleged incident and that his "duties at the time . . . [were] in furtherance of interstate commerce." (Doc. 15) at 3.

The sole count brought against BNSF claims "negligence; violation of [FELA]," based on BNSF's purported failure to: 1) "maintain the Kubota in a safe operating condition;" 2) "provide LaJeunesse with a work vehicle that was of sufficient size to safely carry the tools and equipment required for his assigned duties;" and 3) "maintain the right-of-way alongside the lead track in a safe condition." (Doc. 1) at 3.

BNSF now moves for dismissal of LaJeunesse's complaint as a sanction for LaJeunesse's alleged discovery abuse, under Federal Rules of Civil Procedure 26, 37, and 41, and the Court's inherent authority. (Doc. 53). Specifically, BNSF alleges LaJeunesse lied, under oath, in written discovery responses and at his deposition; purposefully engaged in obstructionist behavior at his deposition; and misrepresented facts or otherwise obstructed BNSF's access to discoverable information.

LaJeunesse argues that his "lies" are nothing more than miscommunications or misunderstandings. To the extent the Court disagrees with this description, LaJeunesse contends that BNSF obtained access to all information it sought and may make use of the "lies" as concededly fertile grounds for cross-examination at trial.

II.    Standard of Review

"It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *United States v. Hudson*, 7 Cranch 32, 34 (1812)); *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1043 (10th Cir. 2005) (quoting *Chambers*, 501 U.S. at 43). Such inherent equitable powers include the power to "impose the sanction of dismissal with prejudice because of abusive litigation practices during discovery." *Garcia v. Berkshire Life Ins. Co.*, 569 F.3d 1174, 1179 (10th Cir. 2009).

Dismissing a case for discovery abuse rests within the sound discretion of the trial court. *Chavez*, 402 F.3d at 1044. However, "[b]ecause dismissal is such a harsh sanction, it is appropriate only in cases of 'willfulness, bad faith, or [some] fault of petitioner.'" *Id.* (alteration in original) (quoting *Archibeque v. Atchison, Topeka, and Santa Fe Railway Co.*, 70 F.3d 1172, 1174 (10th Cir. 1995)). Factors courts should consider when determining whether dismissal is an appropriate sanction include:

> (1) the degree of actual prejudice to the defendants; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.

*Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992) (internal citations and quotation omitted). "This list is not exhaustive, nor are the factors necessarily equiponderant." *Chavez*, 402 F.3d at 1044. Dismissal is warranted when "the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits." *Ehrenhaus*, 965 F.2d at 920.

III.     Abuse of the Discovery Process

At issue is the conduct of LaJeunesse and his counsel throughout the discovery phase of this lawsuit.  BNSF points to written discovery responses and LaJeunesse's deposition as the primary sources of misinformation.  To assess the multifarious issues raised in the Motion to Dismiss, the Court addresses, in the order presented, the individual instances of misconduct alleged by BNSF.[1]

As an initial matter, the Court notes that LaJeunesse verified his interrogatory answers on June 21, 2018, "under penalty of perjury" and stated that his answers were "true and correct to the best of [his] knowledge, information and belief."  (Doc. 56-3).  LaJeunesse testified under oath at his July 10, 2018, deposition.  (Doc. 56-4) at 39 (court reporter's certification that she administered oath to LaJeunesse).  At his deposition, LaJeunesse testified that all of his answers were truthful to the best of his ability, that he understood he was testifying under penalty of perjury, and that he did not want to change any of his answers.  (Doc. 56-4) at 37-38 (LaJeunesse Dep. 453:16-455:18).

A.  Previous Back Injuries

Interrogatory No. 9 asked LaJeunesse:

Were your back, buttocks, or lower extremities injured (in any manner) or had you treated with any medical providers for back, buttocks, or lower extremities complaints prior to December 20, 2017?  If so, please identify:
(a) The type of injuries that you had;
(b) How the injury was caused;
(c) What medical provider(s) treated the injuries; and
(d) Identify any person or entity that you believe was responsible for the injury.

---

[1] BNSF also complains of "other discovery abuses," including conduct of LaJeunesse's counsel. (Doc. 56) at 38-41.  Notably, BNSF does not squarely move for sanctions against LaJeunesse's counsel.  The Court does not consider these matters as essential to deciding this Motion to Dismiss, and, therefore, omits discussion of the same.

(Doc. 56-5) at 3-4.  LaJeunesse answered:

   a) In 2012 I injured my back in California working for BNSF Railways, herniated
      three discs[.]
   b) Injury was caused by a stuck laser on the Geo Truck.  I went to pull the laser
      off the back of the BNSF work truck when I heard a loud pop and was instantly
      paralyzed.  I flew home and went to ER in NM.
   c) NM orthopedics, Paradigm, and Dr. Barkalow[.]
   d) BNSF railway[.]

(*Id.*) at 4.

At his deposition, La Jeunesse testified consistently with his Interrogatory answer that he previously experienced back pain when he injured his back in 2012, and that the 2012 injury was his first experience with back pain.  (Doc. 56-4) at 26-27 (LaJeunesse Dep. 361:25-362:5).

Pursuant to a records release, BNSF obtained a June 28, 2010, medical record from Certified Nurse Practitioner (CNP) Susan Banks, with whom LaJeunesse had an ongoing treatment relationship, indicating an appointment for "sciatic nerve?" pain with an intensity of 8/9 out of 10, that persisted for over a month.  (Doc. 56-7) at 1.  The note reads: "Shooting pain at coccyx [sic] – intermit – is rt moving heavy objects x 1 month."  (*Id.*)  In the history section, the note reads: "One month ago, he was working on a thinning project for soil conservation and he was sharpening a saw and bent over and suddenly felt a sharp pain in R posterior iliac crest. Now the pain is bilateral in the S-I joint area and it hurts to lie down or bend over."  (*Id.*) LaJeunesse experienced "point tenderness posterior S-I joint area[;] full [range of motion] hips 0 pain[;] pain on flexion at waist."  (*Id.*)  CNP Banks diagnosed LaJeunesse with back strain, sent him for lumbar-spine x-rays, referred him to "Dr. Michael Crawford in Santa Fe for chiropractic [treatment]," and advised him to follow-up as necessary.  (*Id.*) at 2.

LaJeunesse never clarified or amended his deposition testimony or his Interrogatory answer. Instead, he submitted a Declaration in response to the Motion to Dismiss. (Doc. 64-2) (Declaration of J. LaJeunesse). In relevant part, that Declaration states:

> With respect to the pain I experience in June 2010, I did not remember until Defendants provided my medical records that I experienced pain in my tail bone when I was bending at work over eight years ago. I was referred to a chiropractor and my doctor told me to just take it easy. The issue seemed to resolve itself without any further treatment.

(*Id.*) at ¶ 2.

In response to the Motion to Dismiss, LaJeunesse contends he "simply forgot" about the 2010 incident because it "resulted from bending over rather than a memorable injury," and because "eight years elapsed before the interrogatory and deposition." (Doc. 64) at 6. He also argues that this is essentially a non-issue because he disclosed CNP Banks as a witness in initial disclosures. (*Id.*) at 4-6.

The Court finds it not credible that LaJeunesse did not remember month-long pain that prevented him from comfortably standing up or laying down, and which resulted in spinal x-rays. Notably, LaJeunesse never submitted amended interrogatory responses or corrected his deposition testimony. This failure to recall a previous back injury does not constitute a mere oversight, but instead evinces a pattern of LaJeunesse misrepresenting his history and abilities.

### B.  Extent of Injuries and Post-Incident Activities

Interrogatory No. 5 asked LaJeunesse to:

> Describe the physical or leisure activities/hobbies/sports/labor you were able to and regularly performed prior to December 20, 2017, and any changes in your ability to engage in the leisure activities/hobbies/sports or ability to perform physical labor subsequent to December 20, 2017.

(Doc. 56-5) at 2. LaJeunesse answered:

Prior to Dec. 20, 2017, I played sports: weight training, running, basketball, softball, and volleyball. I have prided myself as being able to do any job for BNSF. Trackman to Inspector, I was able to work with the best. Now I cannot pick up my 14-month-old without pain.

(*Id.*)

At his deposition, LaJeunesse testified that after the December 20, 2017, incident, his doctor put him on a light duty restriction, meaning that he could lift no more than twenty (20) pounds. (Doc. 56-4) at 13 (LaJeunesse Dep. 127:5-15). LaJeunesse stated, however, that he has lifted more than twenty (20) pounds at the gym since December 20, 2017, but has done so "[v]ery little, very little." (*Id.*) (LaJeunesse Dep. 127:16-18). The following exchange occurred when BNSF asked what things LaJeunesse had done at the gym since December 20, 2017:

Q:     Tell me the things you have done at the gym that are over 20 pounds.

A:     I can do a little bit of press, the bench press, no back, nothing back that I can bend over. I can do a little bit of leg stuff that's over 20 but --

Q:     When you say over 20, are you talking 25, 30?

A:     Yeah, probably about 25, 30, something like that, that's what I will rep it and just of -- but, I mean, this is all built by my PT. You know, this is his regimen. This is what he wants me to do.

. . .

Q:     And whether it's -- well, let me ask you this: At the gym, are you able to lift anything greater than 50 pounds?

A:     I'm sure I could on my legs, I'm sure.

Q:     Okay. Have you attempted to?

A:     Rarely. I won't try to chance it.

Q:     So tell me, it sounds like, if I understand your answer, rarely you have attempted to lift more than 50 pounds?

A: Well, the doctor wanted me to start -- Mr. Esparza wanted me to start increasing my load to see how good I was going to be to get a full release, and I am yet to -- I try it, but I am yet to sustain a good amount of weight.

Q: So what's the maximum that you are able to increase your load to at Dr. Esparza's request?

. . .

A: That he has got, he has got me to do 20 pounds. That's all he's got me now --

. . .

A: -- Dr. Esparza. But the physical therapist, under his orders, has me working out on his regiment. And none of them is over 20 pounds. It's like 30, you know, anything at the most. Most of it is Total Gym, so it's your own body weight when I go work out there.

Q: Yeah, that's what I am trying to understand, though. The gym -- maybe I now understand it -- have you lifted anything at the gym more than 20 pounds?

A: Yeah, I have.

Q: Tell me the most you have lifted at the gym.

A: I want to say 50 pounds to at least -- I try to mimic myself to lift something that's going to be the same that I lift, like what we use as tools for BNSF. So our minimum tool that I use, which would be a jack, and that's 40 some pounds. So I got to figure I got to lift at least that much to be able to get back to work. And I can do it for a little bit, but not -- not too long, unfortunately.

Q: So tell me right now how frequently you lift 50 pounds at the gym.

A: I don't go to the gym at all. Right now it's zero.[2]

Q: All right. In the last -- well, since December -- how about that -- since December of 2017, how frequently have you lifted a maximum of 50 pounds at the gym?

---

[2] This testimony, relating to LaJeunesse's gym usage in July 2018, is addressed *infra* in Subsection D.

A:       I don't know how many times I have lifted it. I would say a handful, maybe five times.

Q:       Okay. Have you ever attempted to lift more than 50 pounds?

A:       I attempted, because when I was told to attempt, and it wasn't happening.

Q:       What was the maximum you attempted?

A:       I think I can do the 20 pounds like Dr. Esparza says. I think I can do that.

. . .

Q:       You said you attempted more than 50.

. . .

Q:       I am trying to understand what the maximum over 50 you attempted is.

A:       Oh, over 50, I would say about 50, 50 -- maybe -- I don't know. I would be lying. I don't know what's the max I have done.

Q:       Less than 100, I assume?

A:       Oh, yeah, definitely less than 100, yeah.

. . .

Q:       When you say you tried, you tried with something just around 50 pounds?

A:       Well, I was told to -- not told. I was asked to start working again, start doing physical activity, to start to see, because, you know, I am in the laborious field of our -- of the railroad. And so I started to do some, and I just can't hand, man. It's just unfortunate, but I just -- can do things. I just can't do everything.

Q:       And then that's what I want to know. You said you did some bench press. I understand what that is. You said you did some legs. What were the legs things you did?

A:       Just the squats. He has me doing -- with the body -- it's the body gym. It's just your own weight. You can do a bunch of squats and –

Q:       So not weighted squats, but just physical weights?

A:     I have been adding a little bit, because it's still weighted, because you are weighted on that machine, because you are doing your body weight is what you're doing. So you are lifting weight. It's just so I will compensate, so my body weight on the machine would be less, probably like 30 pounds compared to adding plus much more, you know. And so that's where I am at on the -- on that, but that's the last time I --

. . .

Q:     -- she asked me, is it a Smith machine?

A:     What is it, 40 -- no, no, no. I have been using the -- all six stationary machines, all stationary. I can't --

. . .

A:     He wants me on the body, it's a glider, it's a glide, but it's a stationary leg machine.

Q:     Gotcha. So you are not free weight lifting?

A:     Very little when I do, and when I do, it's like 20 pounds. We are not doing any -- anything.

(Doc. 56-4) at 13-14 (LaJeunesse Dep. 128:1 – 133:24). LaJeunesse continued:

Q:     What's the maximum amount -- since we are talking about squats, we will go there -- what's the maximum amount you have tried to squat since your accident?

A:     I tried to do my body weight when he told me to try and get back to -- get back to gym, back to working mode, and I couldn't do it.

Q:     When you say your body weight, meaning?

A:     I weigh 190 pounds, so I try to at least do half of that, which without -- you know, because the Smith machine weighs a little bit. So I tried probably like a hundred, about 100 pounds, and I couldn't do it. I had two 45s on each side, and I couldn't do it, so I stopped.

Q:     I'm surprised. So you tell me, since that accident, you have squatted over 100 pounds?

A:     The doctor had -- under -- under -- under the physical therapist is a -- with him, I squatted to get back to work to see if I was able to return back to work, because I have to do assessment, and I couldn't do it, so --

(Doc. 56-4) at 28 (LaJeunesse Dep. 367:25 – 368:20).  LaJeunesse then testified he was unable to pick up his 14-month-old daughter without pain.  (*Id.*) (LaJeunesse Dep. 369:19-22).

During the deposition, BNSF confronted LaJeunesse with surveillance video of a man who appears to be LaJeunesse performing multiple repetition sets of squats on a Smith machine, time stamped April 22, 2018, at 7:56:48AM.  (Doc. 56-9) (Clip 3).  When asked if he recognized the person in the video or recognized himself in the video, LaJeunesse responded: "I don't know who it is.  I can't tell.  It's too blurry," and "[i]t's too blurry, no."  (Doc. 56-4) at 31 (LaJeunesse Dep. 416:6-7; 416:20).  When asked what the person in the video was doing, this exchange followed:

Q:     What is the guy doing in the video?  I understand you have denied --

A:     I don't know what he is doing.  I can't see.  It's very blurry.

Q:     You can't see that he's squatting?

A:     I can't see.  That's your opinion.  I don't know.

(Doc. 56-4) at 32 (LaJeunesse Dep. 420:9-16).

BNSF pressed LaJeunesse on whether he had squatted 275 pounds since December 2017.  The following exchange transpired:

Q:     Can you squat 275 [pounds] since December of 2017?

A:     I don't know.

Q:     Have you tried to squat 275 since December of 2017?

A:     I have no -- I have no -- I don't know, no.  I don't know.

Q:     You don't know whether you have attempted to squat 275 or not?

A:     I never -- I never added weight no, I don't know.  I'm sorry.

Q: My question, to be clear, because this is really important, you don't know yes or no whether you have attempted to squat, I will say over 200 pounds since December of 2017?

A: That, I don't know if I have or not. I never measured.

(Doc. 56-4) at 32 (LaJeunesse Dep. 420:23 – 421:14).

The Court reviewed the weight-lifting video, along with photographs of LaJeunesse and portions of LaJeunesse's videotaped deposition, and notes that the individual in the video resembles LaJeunesse.[3] Additionally, the video depicts the man placing what appears to be one round, black, standard twenty-five (25) pound weight on each side of the bar of a Smith machine. (Doc. 56-9) (Clip 3 at 0:10-0:23). At 0:29 on the video, the man ducks his head under the bar, places the bar across his shoulders, and performs eight repetitions of weighted back squats to an approximately 90-degree bend of the knees. (*Id.*) (Clip 3 at 0:33-0:57). At 1:02, the man bends

---

[3] *Compare* Exh. 11a (Doc. 56-11) at 1 (screen shot from weight lifting video), *with* Exh. 13 (Doc. 56-13) (screen shot from LaJeunesse's videotaped deposition).



at the waist and knees to pick up what appears to be a large, black, standard 45-pound plate. (*Id.*) The man places one 45-pound weight on each side of the bar, in addition to the 25-pound weight on each side of the bar. (*Id.*) (Clip 3 at 1:02-1:16). At 1:39, the man again ducks under the bar and performs five visible weighted back squat repetitions to an approximate 90-degree bend of the knees. (*Id.*) (Clip 3 at 1:39-1:54). After finishing the second set, the man bends at his waist to grab another 45-pound plate, which he lifts one-handed to waist level. (*Id.*) (Clip 3 at 1:59 – 2:01). The man adds a second 45-pound plate to each side of the bar. (*Id.*) (Clip 3 at 2:02-2:14). The weight, not including the weight of the bar, now totals 230 pounds (two 45-pound weights plus one 25-pound weight on each side = 115 pounds per side; x 2 sides = 230 pounds).[4] Again, the man performs six repetitions of weighted back squats to an approximate 90-degree bend of the knees. (*Id.*) (Clip 3 at 2:45 – 3:03).

Upon completion of this third, heaviest set, the man returns the 45-pound weight plates to the rack, and returns to the Smith Machine with 50 pounds of weight on the bar. (*Id.*) (Clip 3 at 3:12-3:41). The man then returns to the bar and performs two sets of weighted standing lunges to a 90-degree bend of the knees, with each set comprising multiple lunges per leg. (*Id.*) (Clip 3 at 3:42 – 5:27).

In response to Requests for Admissions propounded to him after the deposition, LaJeunesse ultimately admits that he is the man in the weight-lifting video. (Doc. 56-14) at 2.

---

[4] This calculation does not take into account the weight of the bar, which is either 45 pounds or 15 pounds, depending on which version of LaJeunesse's answer one accepts. *Compare* (Doc. 56-4) at 28 (LaJeunesse Dep. 366:24 – 367:3 ("A: I think the bar weighs 45 pounds by itself if you are using a Smith machine, but if you are using other weight, you don't even have to squat using -- you can squat with dumbbells in your hands.")), *with* (Doc. 64-2) at ¶ 3 (Declaration of J. LaJeunesse ("It is my knowledge from over twenty years of working out that a Smith Machine bar is fifteen pounds compared to a forty-five pound barbell.")).

LaJeunesse asserts, in response to the Motion to Dismiss, that he did not recognize himself in the video at the time of his deposition because the "video was played on a small tablet and was of poor quality." (Doc. 64) at 7. He further argues that BNSF "assumes the quantity of weight added and the weight of the bar in its *Motion* without evidence." (*Id.*)

Finally, LaJeunesse notes that a Smith Machine differs from free lifting or dead lifting, including the notion of dead lifting a child from a bent over position. Notably, BNSF submitted a Los Lunas Police Department lapel video, dated January 12, 2018, as Exhibit 47 to its Reply. In the video, LaJeunesse is seen holding what appears to be a 14-month old child, including bending over and standing up with the child in his arms. The Court notes no apparent distress or discomfort. (Doc. 73-7).

In his Declaration, LaJeunesse states:

> When I was shown the April 22, 2018 video at my deposition, it was a short video clip that was shown to me on a small tablet screen. I did not want to admit to something that I was unsure about until I had more time to review the video. I worried that BNSF's lawyers were trying to trick me. I could not see from the video what the weights were or how much the bar weighed. It is my knowledge from over twenty years of working out that a Smith Machine bar is fifteen pounds compared to a forty-five-pound barbell.

(Doc. 64-2) at ¶ 3.

The Court finds it disingenuous, at best, that LaJeunesse claims he could not recognize himself in the video. Furthermore, the argument that BNSF "assumes" the amount of weight loaded on the Smith Machine is simply specious. The weight lifting video obviously shows LaJeunesse loading two 45-pound plates on each of the bar, after loading one 25-pound plate on each side of the bar. It is not believable that LaJeunesse did not remember squatting over 200 pounds at the gym within two months of his deposition.

C.  <u>Physical Therapist</u>

LaJeunesse testified, under oath, at his deposition that his physical therapist instructed him to exceed the twenty-pound lifting restriction and had given him a written regimen that included lifting 45-pound plates.  (*See* Doc. 56-4) at 13 (LaJeunesse Dep. 128:7-13, quoted *supra*).  He further stated that the physical therapist "has me working out on his regimen," which included lifting "at the most" 30 pounds and using a Total Gym, "so it's your own body weight[.]"  (*Id.*) (LaJeunesse Dep. 129:14-19, quoted *supra*).

Later in the deposition, LaJeunesse admitted to picking up a 45-pound plate after December 20, 2017, but stated that this did not violate the 20-pound lifting restriction.  (Doc. 56-4) at 33 (LaJeunesse Dep. 422:23 – 423:9).  The following exchange unfolded:

> Q:    Have you ever handled a 45 pound plate at a gym since December of '17?
>
> A:    Yes.
>
> Q:    Have you picked one up and put it on a rack of any kind?  Have you picked up a 45 pound plate since December of '17?
>
> A:    Yes.
>
> Q:    Did that violate your lifting restrictions?
>
> A:    No, because I was -- I'm still under my physical therapist, his guidelines for physical therapy.
>
> Q:    Has a physical therapist told you to lift 45 pound plates at the gym?
>
> A:    Physical therapist wants me to work out.
>
> Q:    Has a physical therapist told you to lift 45 pound plates at a gym?
>
> A:    Oh, yes, definitely.
>
> Q:    Tell me the physical therapist who told you that.

A:      It's a -- his name is Aragon.  His name is the same physical therapist that made me a workout for the -- for Planet Fitness, so I didn't have to keep going to the physical therapy.  He made me a regimen, yes.

Q:      And the regimen he gave you included lifting 45 pound plates?

A:      It included strength training.

Q:      Did the regiment include lifting 45 pound plates?

A:      I don't know.

Q:      Did the regimen include doing squats of 275 pounds?

. . .

A:      I don't know.

Q:      So how do you follow the regimen if you don't know what it is?

A:      Because I don't know.

(Doc. 56-4) at 33 (LaJeunesse Dep. 422:23 – 424:10).  BNSF pressed LaJeunesse on the lifting restriction:

Q:      Well, haven't you received a recommendation, a restriction of 20 pounds?

A:      Just recently, yeah.

Q:      And you violated that restriction, didn't you?

A:      Did not.

. . .

A:      I am under the direction of my physical therapist, which is a doctor.  So I am under his guidance, and he has already written many statements saying that this is his regimen.

Q:      All right.  Do you have a -- have you seen something from your physical therapist that says you should lift 45 pound plates?

A:      No.  But if you want, I can get it for you.

. . .

A:    No.  The physical therapist has already wrote all the stuff, that I am under
       the direction of my doctor.  I work out with him.

. . .

A:    The physical therapist makes the regimen that I take to work out at at home,
       and at home or in the gym.

. . .

Q:    It's a written regimen?

A:    Yeah, he has a written what he wants me to do, yes.

(Doc. 56-4) at 33-34 (LaJeunesse Dep. 425:7 – 427:11).  LaJeunesse testified that he did not

know if the written regimen said he should lift 45-pound plates or do squats with 200 pounds.

(Doc. 56-4) at 34 (LaJeunesse Dep. 427:12-25).  Despite testifying that he did not know what

exercises were listed on the written regimen, LaJeunesse stated that he does not bring the paper

to the gym with him because "it's already become [his] routine" and he has been doing that

routine for an extended period of time.  (*Id.*) (LaJeunesse Dep. 428:1-12).

       The physical therapist, Isaac Aragon, Doctor of Physical Therapy (DPT), produced a

letter explaining that he had been treating LaJeunesse for "Lumbar Disc Degeneration and

Spondylosis from 1/4/18 to 4/19/18."  (Doc. 56-15).  Aragon expressly states that LaJeunesse

"was eventually discharged from care, as [Aragon] felt he was fully independent with home

exercise program, and applying rehab principles to his own workout regimen."  (*Id.*)  Further,

Aragon "cleared [LaJeunesse] for participation in resistance training and cardiovascular exercise

while adhering to the aforementioned principles, making clear that [LaJeunesse] is to remain

under the restrictions set forth by his referring provider until notified otherwise."  (*Id.*)

       The "written regimen" includes body weight exercises – that is, using one's body as the

only weight – and two exercises using a weight: a "bird dog," including a five-pound row

exercise; and wall squats with a Swiss ball, holding a six-pound weight.  (Doc. 56-17) at 1-3; *see also* (Doc. 56-20) (Paradigm exercises).

Request for Admission 12 asked LaJeunesse to "[a]dmit that squatting 200 pounds or more of weights added to your body weight was not part of the 'regimen' provided to you by your physical therapist that you testified about on July 10, 2018."  (Doc. 56-14) at 2.  LaJeunesse marked "DENY" and explained: "As Plaintiff previously explained, he understood that he was permitted to lift weights equal or less than his body weight, so this would depend on his body weight."  (*Id.*)

LaJeunesse later responded to BNSF's Second Requests for Admission, served on him on October 4, 2018 (*see* Doc. 50) (Certificate of Service):

14.  Admit that no documents exist that reflects any instruction given to you by any medical provider to perform exercises at the gym or at home that involve exceeding the lifting restrictions give to you by Dr. Esparza.

RESPONSE:  ADMIT.

15.  Admit that none of your medical providers gave you verbal instructions to perform exercises at the gym or at home that involve exceeding the lifting restrictions give to you by Dr. Esparza.

RESPONSE:  ADMIT.

(Doc. 56-18).

In response to the Motion to Dismiss, LaJeunesse asserts that he was "mistaken about his physical therapist's instructions."  (Doc. 64) at 10.  In his Declaration, LaJeunesse states:

> Dr. Esparza told me to try to do exercises that would help me get back to work.  My physical therapist told me that I could lift "up to my body weight."  I believe I weighed just over 200 lbs in April, and believed that meant he was advising me that I was permitted to lift just over 200 lbs.

(Doc. 64-2) at ¶ 6.

The Court finds that LaJeunesse's answers are, at best, inconsistent and knowing misrepresentations. On the one hand, he admits that no medical provider instructed him to exceed the 20-pound lifting restriction. On the other, he submits a Declaration to this Court, under penalty of perjury, averring that he believed Isaac Aragon told him he could lift up to 200-pounds. LaJeunesse cannot have it both ways. Furthermore, LaJeunesse declares that he has over twenty years of weight lifting experience. No person with that much physical training experience could believe that a body weight restriction imposed following an injury would mean loading the bar with weight equal to one's body weight. Indeed, "body weight" exercises mean, as established by Isaac Aragon and the written exercise sheets, using one's body as the weight.

D. Gym Use

LaJeunesse testified that he had not gone to the gym at all in the thirty (30) days preceding his deposition on July 10, 2018. (Doc. 56-4) at 12 (LaJeunesse Dep. 124:13-18). LaJeunesse testified that, prior to this recent hiatus, the physical therapist had him "on a pretty good regimen . . . going like three days a week," with semi-weekly appointments at Paradigm (the physical therapist's office), after which LaJeunesse would go to Planet Fitness (a gym). (*Id.*) (LaJeunesse Dep. 125:6-16). He then testified that he had not been to Planet Fitness in about 60 days, his "account is already closed there and everything," and he had not joined another gym. (*Id.*) (LaJeunesse Dep. 125:17-25). BNSF attempted to confirm that LaJeunesse had not been to Planet Fitness for the preceding 60 days. LaJeunesse equivocated, and stated: "Within 60 days, maybe, maybe -- I could pull a log. I would say maybe three times in 60 days, mostly to do some light cardio and stretching, but not much." (*Id.*) at 13 (LaJeunesse Dep.

126:3-6).  Later in the deposition, LaJeunesse reverted to saying he had not been to Planet

Fitness "in almost two months."  (*Id.*) at 35 (LaJeunesse Dep. 431:18-23).

BNSF subpoenaed LaJeunesse's Planet Fitness logs.  The logs reflect that, prior to his

July 10, 2018, deposition, LaJeunesse checked in at Planet Fitness on:

> February 14, 21, 27, and 28, 2018
> March 9, 12, 13, 14, 17, 19, 20, 23, 26, 29, and 31, 2018
> April 2, 4, 5, 8, 13, 22, 23, 28, and 29, 2018
> May 2, 3, 6, and 16, 2018
> June 9, 16, and 17, 2018

(Doc. 56-12) at 1 (Planet Fitness logs).

After his deposition, LaJeunesse checked in at Planet Fitness on:

> July 15, 25, 29, and 31, 2018
> August 1, 3, 8, 9, 11, 15, 18, 20, 21, 22, 23, 24, 25, and 29, 2018
> September 1, 5, 7, and 8, 2018

(*Id.*) at 2.  The logs submitted in evidence stop after September 8, 2018.

Indeed, the payment records attached to the Motion to Dismiss reflect no break in

LaJeunesse's Planet Fitness membership from at least February 17, 2018, through at least

September 19, 2018.  (*Id.*)

In response to the Motion to Dismiss, LaJeunesse argues that these are simply

"disagreements about the interpretations of facts—material disputes of fact," and that he "should

have an opportunity to rebut the video evidence and explain with his own evidence what he was

doing, how the machines and weights work, and how it affected him."  (Doc. 64) at 10.

LaJeunesse does not suggest or explain what his "own evidence" might be.

LaJeunesse's statements about the closure of his gym membership and his gym activities

are not credible.  This is not a "dispute of fact" or a "disagreement[] about the interpretation[]" a

fact, it is a lie.  To the country, despite being confronted with a video showing him squatting

over 200 pounds, LaJeunesse stated that he did only "some light cardio and stretching" at the gym, but nothing else. These statements were deliberately false.

E. Prior Complaints Regarding the Kubota

At 11:37 a.m. on December 20, 2017, shortly after the incident at issue, LaJeunesse emailed jfry@atsff.org (his union representative), Benedict J. Griego, Carl E. Gallegos, and Raymond J. Chavez. (Doc. 56-2) (email). LaJeunesse titled his email: "Non injury statement." (*Id.*) The email reads: "Carl this is to inform you that the Kubota I have been using for the MTI inspections is very rough riding. A solution would be to provide a vehicle to avoid claiming any back injuries. Sent from my iPhone." (*Id.*)

Interrogatory No. 8 and LaJeunesse's answer read:

INTERROGATORY NO. 8: Prior to December 20, 2017, had you ever complained, in any way, including but not limited to: orally or in writing and/or through the BNSF SIRP process, to anyone at BNSF with regard to issues set forth in your Complain regarding the incident (e.g., the Kubota that you were operating at the time of the incident; the need for a work vehicle that was of a different size to safely carry the tools and equipment required for your assigned duties; the maintenance of the right-of-way alongside the lead track; providing a proper and adequate drainage system in the area where the incident occurred)? If so, please identify:

      (a) A description of any complaints;
      (b) The dates of any complaints;
      (c) Identify any person or entity that you reported your complaint to;
      (d) Identify the manner of any complaint.

ANSWER: I had many verbal and email conversations with the DE Ray Chavez and RDM Carl Gallegos about the mechanical and structure issues the Kubota had and requested a different kind of vehicle to conduct inspections. Their response was always the same "we will look into it".

(Doc. 56-5) at 3.

Nonetheless, at his deposition, LaJeunesse testified that his December 20, 2017, email was the first time he told anyone at BNSF, in writing, that the Kubota was insufficient to perform his duties or otherwise warranted any concern. (Doc. 56-4) at 15 (LaJeunesse Dep. 171:7-21).

In response to the Motion to Dismiss, LaJeunesse argues that he told the truth at the deposition because he testified to one email communication and two verbal communications. (Doc. 64) at 11.

The Court notes that the email communication at issue occurred after the alleged injury. Indeed, while LaJeunesse did testify to two verbal conversations with Ray Chavez that predate the alleged injury, his interrogatory answer states that he had "many verbal and email conversations" with Ray Chavez and Carl Gallegos before the alleged incident on December 20, 2017. The Court finds LaJeunesse's statements and testimony regarding his prior complaints, at best, misleading.

F.  Prior Drug Use

LaJeunesse obtained a medical marijuana, or medical cannabis, card following the alleged December 20, 2017, incident. (Doc. 56-4) at 2 (LaJeunesse Dep. 16:21 – 17:3) (testifying he obtained medical marijuana card in 2018). When asked if he had used marijuana recreationally prior to obtaining the medical marijuana card, LaJeunesse stated: "Never, never ever." (*Id.*) (LaJeunesse Dep. 17:15-18). LaJeunesse continued to be clear about his lack of prior marijuana use:

Q:  So was March of 2018, in that timeframe, the first time you obtained a marijuana product?

A:  Since high school, yes, but I have never used it on a recreational. I used it in high school, but the doctor talked to me about the product and how he thought it was better than the pills that have been coming out and all this stuff, that he recommended this over anything else. And so he kind of

convinced me to go forth with it, and -- but it's just, to be honest it's, just not strong enough for my pain to be honest.

Q:   So I want to make sure I understood your answer.  Since high school, so when you graduate -- what year did you graduate high school?

A:   2000, 18 years.

Q:   So from 2000 to 2018 until you received your card in 2018, from 2000 you were not using marijuana?

A:   No.

Q:   Did you possess marijuana?

A:   I was not using -- a recreational user of marijuana.

Q:   Were you a medical user?

A:   No.  I was -- I didn't -- I wasn't smoking.  I was never a smoker.

(Doc. 56-4) at 2-3 (LaJeunesse Dep. 17:19 – 18:19).

Later in the deposition, BNSF confronted LaJeunesse with a 2006 charge for possession of marijuana.  The following exchange occurred:

Q:   . . . references a charge of possession of marijuana as well.

A:   Yes.

Q:   What do you know about that?

A:   It says one ounce or less, yeah, I am sure they found something in there, my ex did.  She did smoke, and so there was some around, so -- and I probably did have some around in the area that I was charged, and I do -- yes, it was a charge, and it was dismissed.

Q:   Did you possess marijuana?

A:   It says dismissed.

Q:   I am asking you a question.

A:   Sorry.

Q:      Did you possess marijuana in 2006?

A:      Yes.  There was a possession, yes, 2006.

Q:      That was after you were out of high school?

A:      Yes.

Q:      How frequently did you possess marijuana at that time --

A:      It wasn't --

Q:      -- after graduating high school?

A:      It wasn't a recreational thing.

Q:      What was it then?

A:      It was just -- I barely -- I probably just had a little -- a little bit.  I mean, it was just a -- I'm sorry, it was a recreational -- it wasn't a daily smoking.  It was less than an ounce, so it was probably nothing.  It was probably maybe a little bit of pot, less than an ounce.[5]

Q:      You were using it recreationally at that time?

A:      No, I wasn't -- I'm saying at the time, I probably wasn't -- I was barely using it.  I wasn't it using it daily.  I wasn't recreational, every day.

. . .

Q:      . . . What in your mind is very little recreational use of marijuana in 2006?

A:      That was probably about once a month.

(Doc. 56-4) at 8 (LaJeunesse Dep. 102:7 – 104:7).

In response to the Motion to Dismiss, LaJeunesse argues that he differentiated between

"recreational" marijuana use and being a "smoker," and somehow misapprehended that

recreational use means something different than "simply using marijuana in a non-medical

---

[5] In 2006, possession of "one ounce or less of marijuana [was], for the offense, . . . a petty misdemeanor . . . and, for the second and subsequent offenses, . . . a misdemeanor."  NMSA 1978, § 30-31-23(B)(1) (eff. June 17, 2005, through Mar. 30, 2011).

context." (Doc. 64) at 12. LaJeunesse contends he "did not believe he was a recreational user, because he did not use it every day," and, therefore, he did not lie at the deposition. (*Id.*) at 13.

In addition to failing to acknowledge, in the first instance, his prior drug use, LaJeunesse exhibits continued obstructionist conduct. LaJeunesse's argument that he misunderstood or differently understood the meaning of "recreational" marijuana use is not credible. Instead of directly addressing the question and admitting that he occasionally used marijuana, in whatever form, between 2000 and 2018, LaJeunesse knowingly and intentionally obstructed the discovery process and made his deposition unnecessarily contentious.

G. Communications After the Incident

Early in discovery, BNSF asked LaJeunesse about his communications in the 48 hours following the alleged incident on December 20, 2017. Specifically, Interrogatory No. 7 asked LaJeunesse to "describe in detail all of your activities and communications that are related to the December 20, 2107 [sic] incident in the 48 hours after that incident, including, but not limited to, who you communicated with about the incident and what you told each of them." (Doc. 56-5) at 2. LaJeunesse answered: "I communicated with RDM Carl Gallegos, Safety Assistant BJ Griego, DE Raymond Chavez as described above." (*Id.*) at 3.

At his deposition, LaJeunesse testified that he also spoke with Jeff Fry, his union representative, but did not remember anything about the call. (Doc. 56-4) at 22 (LaJeunesse Dep. 314:2-24).

LaJeunesse's call log, disclosed as part of his initial disclosures, shows nine phone calls between 8:55 p.m. on December 20, 2017, and 8:53 a.m. on December 21, 2017. (Doc. 56-23) (LaJeunesse phone log). The call log reflects one incoming phone call and eight outgoing calls. The outgoing calls were all to different phone numbers, and the log shows the called numbers

were located as follows: four in Albuquerque, New Mexico; one in Houston, Texas; one in Beaumont, Texas; one to Seguin, Texas; and one toll-free number. (*Id.*) At least one of those phone calls, made at 8:55 p.m. on December 20, 2017, was to a personal injury lawyer. (Doc. 56) at 26 (713-425-7200 returns to Sammons and Berry, P.C., in Houston, Texas).

While LaJeunesse initially asserted that he called the Houston law firm on the recommendation of Jeff Fry, (doc. 64-3) at 3 (LaJeunesse Dep. 313:19-23), he later admitted that he did not speak to Mr. Fry until 8:03 a.m. the next morning, December 21, 2017, (doc. 56-4) at 23 (LaJeunesse Dep. 332:21-25).

In response to the Motion to Dismiss, LaJeunesse asserts that he provided the call log and testified honestly about the calls, but simply did not remember the content or order of the calls made. (Doc. 64) at 15. LaJeunesse asserts he testified "to the best of his ability" at the deposition. (*Id.*)

In a vacuum, the Court may have credited LaJeunesse's statements that he simply does not remember the people with whom he spoke immediately following the accident, the order in which he spoke to them, or the substance of those conversations. The Court finds, in the broader context of this litigation, that it is not believable that LaJeunesse does not remember speaking with an attorney eight hours before he went to the hospital, (doc. 56-4) at 23 (LaJeunesse Dep. 330:2-4 ("A: At 4:00[a.m.], I made the decision a little earlier when I went to the restroom, and, yes, I decided to go to the hospital."), does not remember the substance of his conversations with at least the attorney and Fry, and does not remember that he spoke to Fry – the union representative – until after he had gone to the hospital.

H.  Social Media Use

At LaJeunesse's deposition, BNSF introduced three of his social media posts.  After the deposition, BNSF served its Second Set of requests for Production.  (*See* Doc. 39) (Certificate of Service).  Request for Production No. 25 asked LaJeunesse to "provide copies of all photographs or video posted by Plaintiff or anyone acting on his behalf on Facebook, MySpace, Google+, YouTube, Instagram, Plenty of Fish, or any other social networking website and mobile social media applications from December 20, 2017, to the present."  (Doc. 56-19) at 1.

The Response states:

Plaintiff has no additional documents responsive to this request, any documents were discussed in Plaintiff's deposition.  Plaintiff is not aware of any accounts on MySpace, Google+, YouTube or Plenty of Fish, however he is aware that there is another Jeremy Lajeunesse that may have these accounts.  Plaintiff has no control whatsoever over those accounts.

(*Id.*) at 1-2.

BNSF, convinced that LaJeunesse possessed other responsive documents, approached LaJeunesse and his counsel to resolve the issue.  After some not always professional exchanges and attempts to resolve the issue, LaJeunesse produced "a few more screen shots of social media[]".  (Doc. 56-31).

Ultimately, LaJeunesse neither objected to nor fully complied with the Request for Production.  (*See, e.g.* Doc. 56-33) (additional photos not produced by LaJeunesse).

In response to the Motion to Dismiss, LaJeunesse argues that he "has long understood that his former BNSF supervisors . . . were Facebook 'friends' and had immediate access to his public and private Facebook posts."  (Doc. 64) at 16.  LaJeunesse argues that his failure to properly respond to Request for Production No. 25 is excusable because "he believed Defendant already could access" those materials.  (*Id.*) at 16-17.  Indeed, in his Declaration, LaJeunesse

states: "I assume that John and Carl take screenshots of everything I post anywhere and give it to BNSF's lawyers." (Doc. 64-2) at ¶ 8. Therefore, LaJeunesse asserts he did not misrepresent his social media use.

LaJeunesse points to no authority which would permit him to neither object nor respond to a request for production based on having Facebook friends or Instagram followers who work for the opposing party. Indeed, LaJeunesse tacitly admits to having responsive materials that he knowingly and willfully refused to produce. The Court finds that LaJeunesse knowingly, intentionally, and willfully misrepresented his social media use in response to Request for Production No. 25.

I. <u>Motorcycles</u>

LaJeunesse has owned at least one motorcycle at a time for the last fifteen years. (Doc. 56-4) at 19 (LaJeunesse Dep. 229:3-8). At the time of his deposition, LaJeunesse owned a Harley-Davidson Fat Bob motorcycle, could not remember if he purchased the motorcycle before or after December 20, 2017, but testified that he did not buy a new one "recently." (*Id.*) (LaJeunesse Dep. 227:12 – 228:6). When asked how frequently he rides the motorcycle, LaJeunesse stated: "Not too often unfortunately, but I would say maybe I like to go once a week, somewhere, at least to get on it. I feel like I've -- spending my money somewhere." (*Id.*) (LaJeunesee Dep. 228:9-13).

After the deposition, BNSF sent LaJeunesse a request to produce "[a]ny and all service, repair, purchase or sale records for any motorcycle or motorbike owned by you from December 20, 2017, to the present date." (Doc. 56-19) at 1 (Request for Production No. 24). LaJeunesse responded that he "has no documents responsive to this request, any documents are outside the requested date range." (*Id.*)

BNSF followed up on this issue by letter dated September 5, 2018. (Doc. 56-28) at 2 (letter to LaJeunesse's counsel). In the letter, BNSF states: "We believe Plaintiff purchased a Harley Davidson in February 2018 and/or March 2018. So is he saying responsive documents just aren't in his possession? He hasn't gotten any oil changes on any of his bikes in the last eight months?" (*Id.*) LaJeunesse's counsel responded via email on September 26, 2018, and stated: "It is my understanding that Mr. Lajeunesse has not purchased a motorcycle in the timeframe given based on his deposition. It is my understanding that he has had no oil changes because he has not been riding the motorcycle much if it all since his injury." (Doc. 56-29) at 1 (response letter from LaJeunesse's counsel).

However, LaJeunesse posted a photo of a motorcycle to his Instagram account on March 27, 2018, with the caption, "New Bae! #harleydavidson #fatbob #114 #bobber #projectbobber." (Doc. 56-26) at 2. Additionally, a Sales Deal Summary from Duke City Harley-Davidson, produced pursuant to a subpoena from BNSF, shows that LaJeunesse purchased the Harley softail Fat Bob motorcycle on March 27, 2018, for a total unit price of $19,489.00, with an additional $1,241.67 in other fees. (Doc. 56-35). LaJeunesse made a $900.00 down payment, and financed the remaining $19,830.67 through Harley-Davidson at 22.350% APR over an 84-month term. (*Id.*) All told, LaJeuensse committed to make 84 monthly payments of $468.85, totaling $39,383.40. (*Id.*)

The record suggests LaJeunesse never corrected or updated his response to the Request for Production or his deposition testimony to reflect the motorcycle purchase.

In response to the Motion to Dismiss, LaJeunesse's counsel appears to take responsibility for this "misunderstanding." The Response states: "It became clear during good-faith correspondence that Plaintiff's counsel misinterpreted Plaintiff's testimony and believed he said

he did not purchase a motorcycle after the injury." (Doc. 64) at 13. Thus, LaJeunesse argues that he was honest at the deposition and any disingenuous response to the Request for Production fell to counsel's lack of competence, diligence, and/or communication.

The Court finds this episode particularly troubling because it implicates the attorney/client relationship. Counsel's statements, however, are not material to deciding this Motion. Instead, the Court notes that LaJeunesse committed himself to $40,000 of payments on a motorcycle over a period of seven years, while claiming that he is too injured to ride the motorcycle and too injured to work. The Court finds it unbelievable that LaJeunesse did not remember purchasing the Fat Bob motorcycle three-and-a-half months before his deposition, and construes LaJeunesse's misrepresentations on this point as willful and knowing.

J.   Obstructionist Behavior[6]

LaJeunesse does not claim a brain injury or any other sort of mental infirmity. Furthermore, he testified that he had not used medical marijuana for approximately three days prior to his deposition, (Doc. 56-4) at 2 (LaJeunesse Dep. 14:9-21), nothing impaired his ability to answer questions truthfully, (*id.*) at 37 (LaJeunesse Dep. 453:16-25), and he understood he was testifying under penalty of perjury, (*id.*) at 38 (LaJeunesse Dep. 454:3-5). After confirming these things, the following exchange occurred:

> Q:   So when you have answered your questions you don't know, then you have absolutely no knowledge on them?
>
> A:   Yeah, that's the truth. Yeah, the truth.
>
> . . .
>
> Q:   All right. So you stand by each and every answer you have given today as the . . . as the complete truth?

[6] Instances of "obstructionist behavior" appear peppered throughout BNSF's Motion to Dismiss. For ease of reference, the Court aggregated each instance into this section.

A:       Yes.  Again, yes.

(Doc. 56-4) at 38 (LaJeunesse Dep. 454:17 – 454:18).

Nonetheless, LaJeunesse answered questions with some variant of "I don't know" or "I don't remember" a purported 293 times during the deposition.  (Doc. 56) at 32.  Some, though certainly not all, examples of "I don't know" or "I don't remember" include not being able to identify his truck in video or photographs, not being able to identify himself in video, not recognizing or remembering conversations immediately following his alleged accident, and not knowing or remembering the size of the potholes that allegedly caused his injury.  Below, the Court addresses three instances of LaJeunesse's obstructionist behavior at the deposition.

### 1.    *Inability to Identify His Truck*

With respect to LaJeunesse's inability to identify his truck, the following exchange transpired after LaJeunesse viewed a surveillance video of him and his truck at a Home Depot:

Q:       Again, is that you in the back of your truck?

A:       Yes.

. . .

Q:       . . . You jumped from the tailgate of your truck to the ground, correct?

A:       Yes.

. . .

Q:       Can you jump in and out of your truck today?

A:       I don't know how far -- that particularly wasn't very far.  That was less than what we are looking at.  And so if I can jump out, I don't -- if I can do that, I can probably that height, yes, I can.

Q:       Well, sir, that's your truck, right, your black Dodge?

A:       Have you seen it?

Q:      Sir, is that your truck?

A:      I can't see the license plate on it.

Q:      Look at the picture, and tell me, does that appear --

A:      I can't --

Q:      -- to be?

A:      I see half a truck, so I don't know.  Sorry.

Q:      Does that appear to be your truck?

A:      I can't tell from that picture.  I'm sorry.

Q:      Do you recall if you used your truck on that date?

A:      I cannot recall.

Q:      So you don't know one way or the other whether that's your truck?

A:      I can't tell.

Q:      Well, do you have a Harley-Davidson sticker in the back of your truck?

A:      I can't tell if it's a Harley-Davidson sticker.

Q:      Do you have a sticker in back of your truck?

A:      I have multiple stickers in the back of my truck.

Q:      Do you have two stickers in the back part of your truck?

A:      But you're telling me that that's --

Q:      Stop.  Do you have two stickers in --

A:      Yes.

Q:      -- the back of your truck?

A:      Yes.

Q:     Do those stickers appear to be similar to the stickers you have in the back of your truck?

A:     Your picture is so blurry I can't -- I don't know.

Q:     So you are really going to deny that's your truck?

A:     Well, you're telling me that it --

Q:     Hold on.  Do you deny that's your truck?

A:     I say your picture is blurry is what I am saying.

Q:     Okay, I'm going to ask you my question.

A:     That's all I'm saying.

Q:     Yes or no, do you deny that's your truck?

A:     I don't know.

. . .

Q:     Hold on.

A:     I answered it.  I don't know.

Q:     My question is yes or no, are you denying that your truck?

A:     I don't --

. . .

Q:     That's a nonresponsive answer.  Either you are denying that's your truck, or you are not denying that's your truck.

A:     I'm still going to --

. . .

A:     I'm still going to say I don't know.

(Doc. 56-4) at 29-30 (LaJeunesse Dep. 407:14-16; 409:10-12; 409:25 - 412:24).

The Home Depot video LaJeunesse viewed is attached to the Motion to Dismiss as Doc. 56-9, clips 1 and 2. The Court reviewed these videos. Clip 1 is fourteen seconds long and time-stamped at 2:46:55 p.m. on April 21, 2018. (Doc. 56-9) (Clip 1). The video begins with LaJeunesse standing on the ground near a truck. The tailgate of the truck is open, and the opened tailgate is approximately elbow-height on LaJeunesse. (*Id.*) at 0:01. LaJeunesse then lifts his left leg straight onto the tailgate and jumps up. (*Id.*) at 0:02. Once in the back of the truck, LaJeunesse is bent all the way over at the waist, with both hands appearing to be on the truck bed, both feet on the truck bed, and his knees slightly bent. (*Id.*) LaJeunesse then stands up, with no apparent discomfort. (*Id.*) at 0:03. From 0:04-0:07, the video shows LaJeunesse bending at the waist to move something in the truck. The truck is black, appears to be raised, and has what appears to be two stickers on the passenger-side of the rear window, one of which appears to be a Harley-Davidson sticker.

Clip 2 is twenty-eight seconds long and time-stamped at 2:47:11 p.m. on April 21, 2018. (Doc. 56-9) (Clip 2). This clip depicts LaJeunesse standing in the back of the raised, black truck and moving a box, which LaJeunesse claimed was empty. (*Id.*) at 0:01. LaJeunesse then slides four stacked deck or patio chairs in the back of the truck. (*Id.*) at 0:11. At 0:18, LaJeunesse bends at the waist and proceeds to slide a patio table box to the back of the truck bed. (*Id.*) at 0:18-0:23. Finally, LaJeunesse squats to approximately a ninety-degree bend at the knees and jumps from the raised truck bed to the ground, where he sticks the landing with no apparent difficulty or discomfort. (*Id.*) at 0:25-0:28.

The truck visible in Clips 1 and 2 appears substantially similar to LaJeunesse's black Dodge Ram. Compare this photograph, (doc. 56-26) at 2 (exh. 26d), of LaJeunesse's truck, from his Instagram account:



with these snapshots from Clips 1 and 2:



(Doc. 56-11) at 2 (Exh.11c);



(*Id.*) (Exh. 11d).

The Court finds it unbelievable that LaJeunesse could not recognize his own truck. In reaching this finding, the Court notes the similarity of the rear-tire rims and the Harley-Davidson stickers on the passenger-side of the truck's rear window. As ownership of the truck has no bearing on the merits of this case, the Court finds LaJeunesse's repeated and false denials to be obstructionist, unnecessary, and abusive.

### 2. *Inability to Identify Himself*

The Court discussed the weight-lifting video *supra*, and provided photographs for comparison at footnote 3. After LaJeunesse viewed the weight-lifting video at his deposition, the following exchange occurred:

Q:     All right. Let's go to the next clip. All right. First of all, let me ask you --

A:     I don't know who that is. I can't tell.

Q:     Do you recognize that as you?

A:     I cannot tell anything, and that picture is too blurry.

Q:     Okay, do you recognize that as you, yes or no?

A:     I'm sorry?

. . .

Q:      Do you recognize that as you, yes or no?

A:      For the thirtieth time, no, it's blurry.

Q:      Sir --

A:      Don't -- don't -- don't --

Q:      -- if you point at me one more time --

A:      Don't go like this to me.  You're making me hostile.  You are getting a hostile environment here.

Q:      Sir, if you point at me one more time, we are going to have a problem.  My question is, is that you in the video?

A:      I don't know.

. . .

A:      Third time, I don't know.

. . .

Q:      At any point, did you recognize yourself in that video?

A:      I don't know who it was.  I can't tell.  It's too blurry.

. . .

Q:      What is that person doing in the video --

. . .

Q:      -- regardless if you know who he is?

. . .

Q:      What is the guy doing in the video?  I understand you have denied --

A:      I don't know what he is doing.  I can't see.  It's very blurry.

Q:      You can't see that he's squatting?

A: I can't see. That's your opinion. I don't know.

(Doc. 56-4) at 31-32 (LaJeunesse Dep. 414:6 – 420:16).

Having reviewed the video, the Court notes that the video is not unviewably blurry, and further notes that both the individual's identity and the nature of his actions are reasonably clear. Accordingly, the Court finds LaJeunesse's repeated statements that he could identify neither himself nor the activity to be intentionally false and obstructionist.

### 3. *Inability to Remember the Potholes at Issue*

In his Complaint, LaJeunesse alleges that he drove over three 18-inch deep potholes in the Kubota. (Doc. 1) at ¶ 4. When asked about the potholes at his deposition, the following occurred:

Q: How big were these [potholes]?

. . .

Q: The ones that caused your injury.

A: Very large sized. I don't know. As a number, I don't know, I mean --

Q: Give me your best estimate of inches.

A: I don't know.

Q: Give me your best estimate of depth.

A: I don't know.

Q: Well, have you ever told your lawyers they were 18 inches deep?

A: Those potholes are probably a lot bigger than that, the ones that we hit.

Q: Deeper than 18 inches?

A: They were pretty deep, yeah. Have you been to the Belen yard? Have you seen what we mess with there? Have you seen the holes in the middle of our roads?

. . .

Q:    Okay. So tell me about what the narrow – on the range of what [the potholes] could have been.

A:    There was multiple holes. There were some that were 8 feet, there were some that were 15 feet wide. There was some that were 3 feet -- 3 inches. There were some that were 18 inches. There were some that were actually --

Q:    There was 15 foot deep holes?

A:    No, 15 feet wide holes.

Q:    That's why I asked you, is the 18 inches referring to depth or width?

A:    The whole hole was more than -- the ones I hit were deep, 18 inches. 18 inches deep, they were deep.

Q:    Okay. How wide were they?

A:    I do not recollect.

. . .

Q:    What was the diameter --

A:    I still don't recollect.

Q:    Okay. So it could have been 1 inch diameter or it could have been 5 inch?

A:    It could have been. It could have been. It could have been 5 feet. It could have been 8 feet. I do not know.

Q:    Fair enough. So the diameter of the hole could have been 8 feet to 1 inch and --

A:    I do not know.

Q:    So it could have been a 1 inch diameter, 18 inch deep hole; is that my understanding?

A:    I'm going to take a break to drink a little bit.

(Doc. 56-4) at 20 (LaJeunesse Dep. 259:4-23); 26 (LaJeunesse Dep. 360:10 – 361:17).

In response to the Motion to Dismiss, LaJeunesse attempts to discount BNSF's complaints about the pot hole deposition testimony as arising because BNSF was "not satisfied" with his testimony. (Doc. 64) at 17.

However, BNSF raised a legitimate complaint because LaJeunesse refused to squarely answer a direct question. Next, the Court finds it implausible that LaJeunesse could not remember and describe the potholes that he allegedly struck, unexpectedly, at five to eight miles per hour, with such force as to cause a protracted spinal injury. The claimed potholes at issue constitute a seminal fact in this case, and a fact uniquely within LaJeunesse's knowledge. LaJeunesse's failure and refusal to testify directly, despite repeated, clear questions, constitutes intentional and willful obstruction of the discovery process.

IV.    Analysis

Simply, BNSF moves for dismissal of this case with prejudice, as well as an award for its costs and attorney's fees, as a sanction for LaJeunesse's personal misconduct during discovery. LaJeunesse argues that he has neither willfully nor even inadvertently abused the discovery process, rendering dismissal and an award of costs and attorney's fees inappropriate. Abundant evidence, however, belies that argument. Based on the willful discovery violations discussed above, the Court finds that LaJeunesse knowingly, intentionally, and willfully lied under oath and abused the discovery process on multiple occasions and to such a degree that dismissal with prejudice is the only appropriate sanction. The Court cannot allow LaJeunesse to abuse the judicial process.

A. *Ehrenaus* Factors

The Court is vested with the authority to impose sanctions, including involuntary dismissal, for a party's failure to comply with the discovery requirements set by local and federal procedural rules. *Chambers*, 501 U.S. at 43 (holding courts have inherent authority to manage cases, including dismissal for abusive practices); *Garcia*, 569 F.3d at 1179 (holding district court has authority to dismiss case with prejudice for abusive discovery practices; Fed. R. Civ. P. 26(g)(3) (giving court authority to sanction party for false discovery responses); Fed. R. Civ. P. 37 (providing court with sanction authority for various discovery abuses); Fed. R. Civ. P. 41(b) (allowing for involuntary dismissal if plaintiff fails to comply with federal rules). Sanctions imposed under this authority aim to penalize bad actors and deter those who might be tempted to flout the rules or abuse the judicial process. *Nat'l Hockey League v. Met. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). The Tenth Circuit has affirmed dismissal with prejudice as a discovery sanction in multiple cases involving less pervasive and/or less severe abuse than that perpetrated by LaJeunesse.

For example, in *Archibeque v. Atchison, Topeka and Santa Fe Ry. Co.*, the Tenth Circuit affirmed dismissal with prejudice of a plaintiff's FELA claim where the plaintiff lied about the extent of previous medical treatment to the allegedly injured body part. 70 F.3d 1172, 1173-74 (10th Cir. 1995). In that case, the plaintiff hid and lied about a ten-year history of pain in her hips and lower back. *Id.* at 1174. No other discovery abuses were noted in that case. While LaJeunesse did not hide a ten-year history of back pain, he engaged in more broad-spectrum and pervasive discovery abuse.

In *Chavez*, the Tenth Circuit affirmed dismissal with prejudice after a jury trial where the plaintiff provided knowingly false and perjurious interrogatory answers and deposition

testimony. 402 F.3d at 1042. There, the plaintiff, contrary to his discovery responses, admitted

at trial that police had pursued him in a car chase prior to his arrest, and that he had evaded

arrest. *Id.* The Tenth Circuit found no abuse of discretion in the district court's conclusion that

"[t]he fact that Plaintiff may have gained nothing as a result of his perjury does not mean that he

should not be sanctioned for his conduct, particularly where analysis of the other *Ehrenhaus*

factors calls for the imposition of severe consequences." *Id.* at 1045-46.

In *Rodriguez v. Presbyterian Healthcare Servs.*, the plaintiff brought a claim against her

former employer for damages stemming from denied leave under the Family Medical Leave Act.

2012 WL12896388, at *2 (D.N.M. 2012), *aff'd* 515 Fed. Appx. 761 (10th Cir. 2013). That

plaintiff lied about obtaining other employment while simultaneously accepting medical leave

and short-term disability payments. *Id.* During her deposition, the plaintiff provided "false

information concerning her start date [at the other job], her working hours there, and when she

informed [her employer] of her employment [elsewhere]." *Id.* She "engaged in the wholesale

obstruction of the discovery process" by answering "I don't know" or "I don't recall" more than

350 times during her deposition, including to basic questions about her employment status and

her life. *Id.* at n.1.

While these cases support a dismissal with prejudice here, the Court, nonetheless,

analyzes the *Ehrenhaus* factors with respect to this case.

### 1. *Degree of Prejudice to Defendant*

False and misleading evidence "substantially prejudices an opposing party by casting

doubt on the veracity of all the culpable party's submissions throughout litigation." *Freddie v.

Martin Transport Ltd.*, 428 Fed. Appx. 801, 804 (10th Cir. 2011); *see also Garcia v. Berkshire

Life Ins. Co. of Am.*, 569 F.3d 1174, 1180 (10th Cir. 2009) (same). Defendants faced with false

testimony are "forced to either attempt independent corroboration of each submission, at substantial expense of time or money, or accept the possibility that every document or statement submitted [by Plaintiff] is incomplete or inaccurate." *Id.* (alteration in original) (quotation omitted). False testimony is intolerable because it is a "flagrant offense" to the truth seeking function of the lawsuit proceedings. *ABF Freight Sys., Inc.*, 114 S. Ct. 835, 839 (1994).

BNSF expended considerable time and effort investigating and identifying LaJeunesse's false statements. LaJeunesse intentionally misled BNSF and this Court regarding his prior injury history and his activities and capabilities following the alleged injury. Furthermore, he obfuscated the truth and obstructed the discovery process regarding the central issue in the case: the size and location of the alleged potholes.

In this position, BNSF was "forced either to attempt independent corroboration of each submission, at substantial expense of time and money," or to accept the possibility that every document or statement submitted by LaJeunesse is incomplete or inaccurate. *Id.* at 1180. The Court finds that BNSF was substantially and materially prejudiced by the expense and doubt resulting from LaJeunesse's repeated and intentionally false statements and misrepresentations.

### 2. *Amount of Interference with Judicial Process*

"[W]hen false evidence or testimony is provided under oath, knowingly and with intent to deceive, a party commits a fraud on the court." *Garcia*, 569 F.3d at 1181. "[T]he greatest consequence of lying under oath is the affront to the law itself." *ABF Freight Sys.*, 510 U.S. at 320; *Rodriguez*, 2012 WL 12894833, at *10 (quoting same). "Lying under oath . . . erodes public confident in the judiciary and interferes with the judicial process. Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts, and threatens the entire judicial system." *Villa v. Dona Ana*

*Cty.*, 2011 WL 13291099, at *14 (D.N.M. 2011) (quotation omitted), *aff'd* 500 Fed. Appx. 790 (10th Cir. 2012).

As discussed above, LaJeunesse not only obstructed the discovery process and forced BNSF to double-check every representation, he also lied under oath—at his deposition and in interrogatory answers. Sanctions are necessary to deter deceptive and misleading conduct.

The Court finds that the judicial process has been undermined by LaJeunesse's conduct in this litigation, and that LaJeunesse has interfered with the judicial process by engaging in deceptive and misleading tactics, lying under oath, and necessitating court intervention.

### 3. *Culpability of Litigant*

Dismissal with prejudice is the harshest of sanctions, and mandates some "willfulness, bad faith, or fault of the petitioner." *Archibeque*, 70 F.3d at 1174. There is no question that LaJeunesse is culpable. He lied under oath on numerous occasions, including material and immaterial falsehoods. He professed, under oath, that he did not remember or could not recall otherwise clearly memorable details at least 200 times. The Court does not presume to know what kind of advice LaJeunesse may have received, but his conduct was his own. It is clear that LaJeunesse willfully and intentionally obstructed the discovery process and misled or lied to BNSF.

The Court finds that LaJeunesse's pervasive pattern of misrepresentation, obstruction, and outright lies was undertaken knowingly, intentionally, and in bad faith. Thus, LaJeunesse is personally culpable for the above-discussed violations. He was able to provide more complete and truthful responses, but failed to do so as required by law and the oath under which he testified.

4.  *Advanced Warning*

"Notice is not a prerequisite for dismissal under *Ehrenhaus*." *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1149 (10th Cir. 2007) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 632 (1962) (upholding dismissal with prejudice predicated on trial court's inherent authority and stating that "absence of notice as to the possibility of dismissal . . . [does not] necessarily render such a dismissal void.")); *Archibeque*, 70 F.3d at 1175 (affirming dismissal pursuant to *Ehrenhaus* despite absence of warning about imminent dismissal).

The Court has not previously warned LaJeunesse that dismissal would be a likely sanction for continued abusive, obstructionist, and untruthful conduct during discovery. However, such a warning was not necessary here. In circumstances such as these, where a party has lied under oath, it is unnecessary to warn that party before dismissing the case with prejudice. *Chavez*, 402 F.3d at 1045. "Once a witness swears to give truthful answers, there is no requirement to warn him not to commit perjury or, conversely to direct him to tell the truth. It would render the sanctity of the oath quite meaningless to require admonition to adhere to it." *Webb v. Texas*, 409 U.S. 95, 97 n. * (1972) (citation and quotation omitted). "[B]ecause the perjurious testimony was given under oath, an additional warning would have been superfluous." *Chavez*, 402 F.3d at 1045.

Therefore, the Court finds that it was not necessary to provide LaJeunesse with an additional warning that his case would be dismissed with prejudice if he lied during discovery.

5.  *Efficacy of Lesser Sanctions*

The misconduct in this case is not limited to a single event. Instead, LaJeunesse evinced a pattern of willful disregard of discovery obligations and the sanctity of his oath. Dismissal with prejudice is necessary not only to "penalize those whose conduct may be deemed to warrant

such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). Additionally, it is not mandatory for the Court to impose a lesser sanction, other than dismissal, first. *Hobratschk v. Perretta*, 210 F.3d 389, 2000 WL 313530, at *2 (10th Cir. 2000).

When confronted with all of his misdeeds, LaJeunesse does not admit his oath and discovery violations, but instead argues that they create fertile ground for cross-examination. The Court finds this redirection to be another step in LaJeunesse's inability or refusal to accept and comply with discovery obligations in this case.

The Court finds that LaJeunesse repeatedly and willfully obscured, hid, and outright denied the truth in response to interrogatories, requests for admissions, requests for production, and deposition questions. There is no conceivable set of circumstances, no matter how generously construed in LaJeunesse's favor, under which his conduct could be considered anything other than intentional and abusive. As such, lesser sanctions cannot address the magnitude of the discovery abuse at issue here.

### 6. *Factors Considered Together*

In sum, the *Ehrenaus* factors weigh against LaJeunesse and in favor of dismissal with prejudice. These factors, as applied to the facts of this case, outweigh the judiciary's strong interest in resolving claims on their merits. Indeed, the Tenth Circuit has affirmed dismissal of cases on similar and less egregious grounds, as discussed above. Here, LaJeunesse's pervasive pattern of misrepresentation, obstruction, and outright lies render the Court's decision to grant BNSF's Motion to Dismiss this case neither close nor marginal. For the reasons discussed above, BNSF's Motion to Dismiss with prejudice is granted pursuant to Federal Rules of Civil Procedure 26(g)(3), 37(b)(2) and (c), and 41(b).

B.  Costs and Attorney's Fees

Where a motion for sanctions is granted under Rule 37(b), the court generally "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure . . . ."  Fed. R. Civ. P. 37(b)(2)(C). Additionally, Rule 26(g)(3) provides that the Court "must impose an appropriate sanction on the signer [of disclosures and discovery responses], the party on whose behalf the signer was acting, or both[, and t]he sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation."  Additionally, "a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Chambers*, 501 U.S. at 45-46 (internal citation and quotation omitted).

The Court has found that LaJeunesse willfully, wantonly, and in bad faith failed to comply with his oath, failed to submit true and accurate interrogatory answers, and allowed misleading and incomplete responses to requests for production.  Accordingly, the Court concludes that it must award sanctions against LaJeunesse.[7]

Within ten days from the date of entry of this Memorandum Opinion and Order, BNSF will file a motion for costs and fees, supported by bills and/or affidavits, detailing which violations it believes warrant costs and fees, and totaling the claimed requests.  BNSF's motion will be no more than 20 pages long, exclusive of exhibits.  Within ten days from BNSF's filing of its motion for costs and fees, LaJeunesse will respond to the motion, including clear identification of disputed costs and fees.  LaJeunesse's response will be no more than 20 pages

---

[7] BNSF does not squarely move for sanctions against LaJeunesse's counsel.  However, the primary conduct at issue here is that of LaJeunesse, personally.  Accordingly, the Court does not consider whether sanctions against LaJeunesse's counsel would be appropriate.

long, exclusive of exhibits.  No reply will be considered.  Any motion or response that does not comply with these deadlines will not be considered.

V.      Conclusion

For the reasons discussed above, the Court finds that LaJeunesse knowingly and intentionally lied under oath, made material and false misrepresentations, and abused the discovery process.  No sanction less severe than dismissal with prejudice exists to adequately address the egregious misconduct in this case.  Accordingly, the Court grants BNSF's Motion to Dismiss and grants BNSF's request for an award of costs and attorney's fees.  The parties will brief the costs and attorney's fees issue as outlined above.  The Court will not enter final judgment in this case until it has resolved the costs and attorney's fees issue.

IT IS, THEREFORE, ORDERED that

1. Defendant BNSF's Motion to Dismiss Plaintiff's Complaint as a Sanction for Plaintiff's Willful Abuse of Discovery Process (Doc. 56), filed November 16, 2018, is granted;

2. All claims that Plaintiff Jeremy LaJeunesse's has or could have brought against BNSF as a result of the alleged December 20, 2017, incident are dismissed with prejudice;

3. The parties will brief the costs and attorney's fees issue as outlined above; and

4. The Court retains jurisdiction over this case and will not enter final judgment until it has resolved the costs and attorney's fees issue.

UNITED STATES DISTRICT JUDGE